[No. B218660. Second Dist., Div. One. Jan. 26, 2011.]

COUNTY OF ORANGE, Plaintiff and Appellant, v.
ASSOCIATION OF ORANGE COUNTY DEPUTY SHERIFFS et al.,
Defendants and Respondents.

**COUNSEL**

Kirkland & Ellis, C. Robert Boldt, Elizabeth M. Kim, Robert R. Gasaway and Jeffrey Bossert Clark for Plaintiff and Appellant.

Pacific Legal Foundation, Meriem L. Hubbard and Harold E. Johnson for Pacific Legal Foundation and Fullerton Association of Concerned Taxpayers as Amici Curiae on behalf of Plaintiff and Appellant.

Filice Brown Eassa & McLeod and Paul R. Johnson for California Foundation for Fiscal Responsibility as Amicus Curiae on behalf of Plaintiff and Appellant.

John C. Eastman, Karen J. Lugo; Law Office of Anthony T. Caso and Anthony T. Caso for Center for Constitutional Jurisprudence as Amicus Curiae on behalf of Plaintiff and Appellant.

Lurie Zepeda Schmalz & Hogan and Andrew W. Zepeda for Accounting Professionals as Amicus Curiae on behalf of Plaintiff and Appellant.

Morrison & Foerster, Miriam A. Vogel, Joseph L. Wyatt, Jr., James P. Bennett, Tritia M. Murata; Manatt, Phelps & Phillips and Thomas J. Umberg for Defendant and Respondent Association of Orange County Deputy Sheriffs.

Reed Smith, Harvey L. Leiderman and Jeffrey R. Rieger for Defendant and Respondent Orange County Employees' Retirement System.

Carroll, Burdick & McDonough, Gary M. Messing, Gregg McLean Adam, Jonathan Yank and Jason H. Jasmine for State and Local Public Employees as Amici Curiae on behalf of Defendants and Respondents.

Edmund G. Brown, Jr., Attorney General, Jonathan K. Renner, Assistant Attorney General, Stephen P. Acquisto and Hiren Patel, Deputy Attorneys General, for California Public Employees' Retirement System as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

**JOHNSON, J.**—In 2008, the County of Orange (Orange County or the County) sued the board of the County's retirement plan, claiming that an enhanced retirement formula for prior years of service adopted in 2001 by the County Board of Supervisors violated the California Constitution. The County now appeals from the trial court's grant of motions for judgment on the pleadings and entry of judgment in favor of the Association of Orange County Deputy Sheriffs and the Board of Retirement of the Orange County Employees' Retirement System. We conclude that the past service portion of the enhanced retirement formula does not violate the Constitution, and we affirm.

## BACKGROUND

I. *The Orange County retirement system*

██ The Orange County Employees' Retirement System (OCERS) is a public employees' retirement trust fund, an independent entity that administers the County's retirement system. OCERS is governed by the County Employees Retirement Law of 1937 (CERL). (Gov. Code, §§ 31450, 31468, subd. (*l*)(1).)[1] Orange County employees, including law enforcement (safety

---

[1] Unless otherwise specified, all subsequent statutory references are to the Government Code.

members), receive retirement and other benefits under CERL, which vests the management and funding of the retirement system in a board of retirement (OCERS Board). (§§ 31558, 31520.)

The County funds its retirement benefits through employee and employer contributions, and the retirement system investment earnings; the retirement fund is overseen by the OCERS Board. (§§ 31453.5, 31587.) These annual contributions are intended to fund the retirement benefits earned in the year the contributions are made. (§§ 31620 et seq., 31639 et seq.) The amount of the contributions is set based upon a normal contribution rate, which is a percentage of compensation required to fund the retirement benefits allocated to the current year of service being worked by county employees. Any shortfall between the normal cost and the actual amount determined to be necessary to fund future benefits (an amount based on actual experience) is made up through increases in employer contributions, and is amortized over a period of up to 30 years. (§ 31453.5.)

The benefits that an employee receives upon retirement are calculated according to a statutory formula that takes into account the employee's final compensation,[2] the number of credited years of service the employee had with the County, and a statutory multiplier. CERL provides for a variety of possible formulas for safety members. These include what is commonly called the "2% at 50" formula, which means 2 percent of final compensation, multiplied by the number of service years, for employees retiring at the age of 50. (§ 31664.) Section 31664.1, enacted in 2000, provides for an "additional pension for safety members," commonly called the "3% at 50" formula, which similarly means 3 percent of final compensation, multiplied by the number of service years, for employees retiring at the age of 50. (§ 31664.1, subd. (b).)

II. *December 2001 vote: 3% at 50*

The Association of Orange County Deputy Sheriffs (AOCDS) is the exclusive representative of Orange County deputy sheriffs, sergeants, and investigators for the district attorney's office, all of whom are safety members entitled to OCERS retirement benefits. (§§ 31469.3, 31470, 31470.2.) In May 2001, AOCDS's 1999 memorandum of understanding, reached after collective bargaining with the County and set to expire in October 2002, provided that AOCDS members were entitled to retirement under the 2% at 50

---

[2] An employee's "final compensation" is the highest annual compensation the employee earns while in active service, based on one year or the average of three years. (§§ 31462, 31462.1.)

formula.[3] In May 2001, AOCDS formally asked the County to restructure the retirement terms to the enhanced 3% at 50 formula. After negotiations, in October 2001 the County negotiators and AOCDS representatives signed a tentative agreement to amend the AOCDS contract to adopt the 3% at 50 formula for members retiring on or after June 28, 2002. AOCDS agreed that its members would contribute 1.78 percent of their base salary for 15 months, toward part of the cost of increased payouts under the increased formula. The agreement extended the AOCDS contract for an additional year, to October 2003.

On December 4, 2001, the County Board of Supervisors unanimously approved the amended AOCDS contract. The board voted to adopt resolution No. 01-410, which authorized the 3% at 50 formula for AOCDS members, effective June 28, 2002. The accompanying memorandum of understanding between the County and AOCDS provided that the increased retirement formula would apply to "all years of service," including those years served before the date of the resolution. This portion of the new retirement formula was authorized by section 31678.2, subdivision (a), enacted in 2000, which provides that the board of supervisors could, by resolution, make the benefit formula "applicable to service credit earned on and after the date specified in the resolution, which date may be earlier than the date the resolution is adopted." Pursuant to section 31678.2, subdivision (c), members who had already retired before June 28, 2002, did not receive any increase in pension benefits.

The County had secured an actuarial report in November 2000, which analyzed (among other options) the financial impact of adopting the 3% at 50 formula for all years of service, both past and future. The analysis estimated that the increase in the County's "actuarial accrued liability" for the benefit enhancement for past service was between $99 and $100 million.

The board of supervisors approved and renewed the 3% at 50 formula in subsequent contracts with AOCDS in 2003, 2005, and 2007.

On January 29, 2008, however, the County had a change of heart. The board of supervisors unanimously voted to approve resolution No. 08-005, which stated that the past service portion of the 3% at 50 formula (applying

---

[3] The AOCDS contract required the County to pay all employee contributions that AOCDS members would otherwise pay.

the enhanced benefit formula to past years of service), as adopted in 2001 by the board of supervisors then in office, "was unconstitutional at the time of its adoption and remains unconstitutional today." The board cited a September 2007 actuarial analysis[4] which concluded that the past service portion of the increased retirement benefit totaled $187 million. The resolution authorized the County's attorneys to "seek to obtain a declaration of unconstitutionality and an injunction against OCERS prohibiting it from paying out any benefit increases arising from Board Resolution 01-410 and based on years of service rendered before June 28, 2002, the effective date of that Resolution." The resolution also provided that the County would not seek to recover any amounts already paid out to retirees under the enhanced benefit formula.

## III.  *The County's lawsuit*

On February 1, 2008, the County filed the initial complaint in this action in Orange County Superior Court, naming as the sole defendant the OCERS Board. OCERS filed a motion to transfer venue to Los Angeles County and AOCDS intervened by stipulation. The case was transferred to Los Angeles Superior Court in April 2008. Following a demurrer by OCERS, on July 23, 2008, the County filed a first amended complaint adding AOCDS as a defendant.

The first amended complaint alleged in its first cause of action that the 2001 action by the prior board of supervisors adopting the past service portion of the enhanced 3% at 50 retirement formula violated the California Constitution's municipal debt limitation in article XVI, section 18, subdivision (a), because without voter approval, the resolution created an immediately incurred and legally enforceable debt or liability of more than $99 million, which exceeded the County's available unappropriated funds for the year. The second cause of action alleged that the past service portion also violated article XI, section 10 of the California Constitution, which prohibits the payment of extra compensation to public employees, because the retroactive portion "grants extra compensation to public employees 'after service has been rendered.' " The complaint requested declaratory and injunctive relief, including an injunction to prevent the County from commencing or continuing to pay the past service portion of the enhanced benefits to retired AOCDS members.

---

[4] In 2007, OCERS had retained an actuarial consulting firm to evaluate the impact of the past service portion (pre-June 28, 2002) of the increase in the pension benefit formula.

In January 2009, AOCDS filed a motion for judgment on the pleadings, in which OCERS joined. In an order filed February 27, 2009, the trial court granted AOCDS's motion, allowing the County leave to amend the municipal debt limitation cause of action "to the extent the County can allege that its liability for that portion of the 3% at 50 pension benefit attributable to past service as of 6/28/02 caused its indebtedness to exceed revenue in any given year since 6/28/02." The order granted the motion without leave to amend on the cause of action alleging extra compensation, concluding "the extra compensation clause does not apply to pension benefits."

The County filed a second amended complaint in April 2009, limited to the municipal debt limitation cause of action. AOCDS, joined by OCERS, filed a motion to strike the new pleading on the ground that it exceeded the limitation imposed by the trial court in its order granting the demurrer. The trial court construed the motion to strike as a motion for judgment on the pleadings, and in an order filed May 22, 2009, the court granted the motion without leave to amend.

The County appeals from the judgment filed July 15, 2009.

## DISCUSSION

In reviewing the trial court's grant of the motions for judgment on the pleadings under Code of Civil Procedure section 438, subdivision (b)(1), we apply the same rules governing the review of an order sustaining a general demurrer. (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 146 [44 Cal.Rptr.2d 441, 900 P.2d 690].) A defendant's motion for judgment on the pleadings should be granted if, under the facts as alleged in the pleading or subject to judicial notice, the complaint fails to state facts sufficient to constitute a cause of action. (Code Civ. Proc., § 438, subd. (c)(1)(B)(ii).) We accept the complaint's properly pleaded factual allegations as true and give them a liberal construction. (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166 [59 Cal.Rptr.3d 142, 158 P.3d 718]; *Boblitt v. Boblitt* (2010) 190 Cal.App.4th 603, 606, fn. 2 [118 Cal.Rptr.3d 788].) We do not accept as true "any contentions, deductions or conclusions of fact or law contained therein." (*Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281, 1298 [38 Cal.Rptr.3d 316].) We review de novo, and " 'are required to render our independent judgment on whether a cause of action has been stated' " (*Mendoza v. Continental Sales Co.* (2006) 140 Cal.App.4th 1395, 1401 [45 Cal.Rptr.3d 525]), without regard for the trial court's reasons for granting the motion. (*Ott v. Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448 [37 Cal.Rptr.2d 790].)

I. *The municipal debt limitation*

Article XVI, section 18, subdivision (a) of the California Constitution provides: "No county . . . shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters of the public entity voting at an election to be held for that purpose . . . ." This municipal debt limitation means " *'the legislative body may not encumber the general funds of the city beyond the year's income without first obtaining the consent of two thirds of the electorate.'* [Citation.]" (*Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164, 175 [140 Cal.Rptr. 73].) This "establish[ed] the 'pay as you go' principle as a cardinal rule of municipal finance." (*Westbrook v. Mihaly* (1970) 2 Cal.3d 765, 776 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds in *Mihaly v. Westbrook* (1971) 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224].) "Each year's income and revenue must pay each year's indebtedness and liability, and no indebtedness or liability incurred in one year shall be paid out of the income or revenue of any future year. The taxpayers of [counties] are thus protected against the improvident creation of inordinate debts, which may be charged against them and their property in ever increasing volume from year to year." (*McBean v. City of Fresno* (1896) 112 Cal. 159, 164 [44 P. 358].)

The County's second amended complaint alleges that in 2001, when the board of supervisors approved the past service portion of the enhanced 3% at 50 retirement formula for AOCDS members, the board created a "$100 million long-term liability (that has since grown to approximately $187 million) . . . ." The County alleges that the board's action violated article XVI, section 18, subdivision (a) of the California Constitution, which it characterizes as a " 'balanced budget' requirement," because the $100 million was an immediately enforceable debt incurred in a year in which the County's unappropriated revenue (for fiscal year 2002) totaled less than $99 million, and the County did not hold the required election to obtain voter approval.

AOCDS rejoins that the $100 million amount which the County on this appeal characterizes as a "debt" is not an " 'indebtedness' or 'liability' " within the meaning of California Constitution, article XVI, section 18, subdivision (a). Instead, it is an actuarial calculation of what the County's obligations are likely to be in the future for the past service portion of the 3% at 50 retirement formula for AOCDS members. As an actuarial projection, the $100 million did not belong on the liability side of the County's balance sheet in the 2002 fiscal year, and it thus escapes the application of the municipal debt limitation.

To evaluate the parties' arguments, we must explain in some detail what the $100 million figure represents.

## A. *Unfunded actuarial accrued liability calculations*

■ The OCERS Board, which has "plenary authority and fiduciary responsibility for . . . administration of the [retirement] system . . . [¶] [and] sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries," also has "the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system." (Cal. Const., art. XVI, § 17, subds. (a), (e).) The OCERS Board is required to conduct regular actuarial evaluations to determine the employer and employee contributions necessary to fund the retirement benefits of county employees, and to "determine the extent to which prior assumptions must be changed."[5] (*In re Retirement Cases* (2003) 110 Cal.App.4th 426, 459–460 [1 Cal.Rptr.3d 790].) The OCERS Board commissioned an actuarial analysis in November 2000 of the proposed changes to the AOCDS pension benefits. The 2000 actuarial analysis produced the $100 million estimate (educated and justified estimate, but estimate nonetheless) that the County now claims was a debt exceeding the County's 2002 annual income, and therefore triggered the municipal debt limitation's requirement of a two-thirds vote of the public.

■ That $100 million figure was an estimated "unfunded actuarial accrued liability" or UAAL, predicting the *unfunded* cost of the retroactive portion of the proposed 3% at 50 retirement formula. This UAAL was not projected in earlier actuarial valuations which did not contemplate the enhancement of the AOCDS retirement formula to 3% at 50. " 'Unfunded accrued actuarial liability' is the difference between actuarial accrued liability and the valuation assets in a fund." (*Bandt v. Board of Retirement* (2006) 136 Cal.App.4th 140, 147, fn. 3 [38 Cal.Rptr.3d 544].) " 'Most retirement systems have [UAAL]. They arise each time new benefits are added and each time an actuarial loss is realized. [¶] . . . [UAAL] does not represent a debt that is payable today.' " (*Id.* at p. 157.)

---

[5] Section 31453, subdivision (a) provides: "An actuarial valuation shall be made within one year after the date on which any system established under this chapter becomes effective, and thereafter at intervals not to exceed three years. The valuation shall be conducted under the supervision of an actuary and shall cover the mortality, service, and compensation experience of the members and beneficiaries, and shall evaluate the assets and liabilities of the retirement fund. Upon the basis of the investigation, valuation, and recommendation of the actuary, the board shall . . . recommend to the board of supervisors the changes in the rates of interest, in the rates of contributions of members, and in county and district appropriations as are necessary." Section 7507, subdivision (b)(1) requires that a local legislative body "when considering changes in retirement benefits . . . shall secure the services of an actuary to provide a statement of the actuarial impact upon future annual costs, including normal cost and any additional accrued liability, before authorizing changes in public retirement plan benefits . . . ."

The County's 2007 Comprehensive Annual Financial Report explains the assumptions underlying the OCERS UAAL: "The UAAL for OCERS is an estimate based on a series of assumptions that operate on demographic data of OCERS' membership. This process is necessary to determine, as of the date of the calculation, how sufficient the assets in OCERS are to fund the accrued costs attributable to active, vested[,] terminated and retired employees. This determination of underfunding rests on actuarial assumptions regarding expected return on invested assets, the assumed future pay increases for current employees, assumed rates of disability, the assumed retirement ages of active employees, the assumed marital status at retirement, the post-employment life expectancies of retirees and beneficiaries, salary increases, contributions to OCERS, inflation, and other factors." Given the multiple assumptions about the future involved in calculating the OCERS UAAL (investment returns, pay increases, marital status at retirement, retiree and beneficiary life expectancies, salary increases, contribution rates, and inflation), it is clear that the UAAL is a highly variable amount, which may or may not prove accurate depending upon actual future events and experience.

■ An unfunded liability such as a UAAL will affect the contribution rate of an employer such as the County. (*In re Retirement Cases, supra,* 110 Cal.App.4th at pp. 459–460.) In projecting the cost of funding the benefits provided to OCERS members, OCERS uses a method described in section 31453.5, which (as explained by OCERS) divides the likely cost of future benefits between the "normal cost" (the employer contributions required to fund the benefits allocated to the current year of service) and the UAAL (the shortfall between the past years' projected normal cost and the actual past experience of the retirement system), which is to be amortized over 30 years.[6] Section 31453.5 authorizes but does not require OCERS to use this method, providing "the board *may* determine county or district contributions . . . ." (italics added) by dividing the cost into normal cost and UAAL. OCERS therefore is not mandated to calculate a UAAL in projecting what the County's future contribution rate will need to be to fund the past service portion of the 3% at 50 formula for AOCDS members. OCERS could employ another method to predict the County's future contributions.

### B. *1982 Attorney General opinion*

■ Article XVI, section 1 of the California Constitution, the debt limitation provision applicable at the state level, is similar to and construed in tandem with the municipal debt limitation in issue here, article XVI, section

---

[6] "The Board's power to amortize the fund's UAAL over a 30-year period . . . allows the County to grant an increase in benefits and to pay for the increased cost of the benefits over time as the associated pension obligations become due." (*Bandt v. Board of Retirement, supra,* 136 Cal.App.4th at pp. 158–159.)

18, subdivision (a). (*Dean v. Kuchel* (1950) 35 Cal.2d 444, 446 [218 P.2d 521]; *State ex rel. Pension Obligation Bond Com. v. All Persons Interested etc.* (2007) 152 Cal.App.4th 1386, 1397–1401 [62 Cal.Rptr.3d 364]; 67 Ops.Cal.Atty.Gen. 349, 351 (1984).) In 1982, the Attorney General concluded that the state retirement system's "unfunded liability" did not violate the state debt limitation provision. The Attorney General explained that "[d]etermining how much income to the [state] Fund is necessary to pay all benefits as they become due is the business of actuaries. Actuaries predict the future financial operation of an insurance or retirement system by making certain assumptions regarding the variables in the system." (65 Ops.Cal.Atty.Gen. 571, 572 (1982).)

The California Public Employees' Retirement System (CalPERS) actuarial balance sheet showed an "unfunded actuarial liability" above the state debt limitation amount. The Attorney General concluded: "The actuarial term 'unfunded liability' fails to qualify as a legally enforceable obligation of any kind. As previously noted the very existence of such an 'unfunded liability' depends upon the making of an actuarial evaluation and the use of an evaluation method which utilizes the concept of an 'unfunded liability.' Further the amount of such an 'unfunded liability' in the actuarial evaluation of a pension system will depend upon how that term is defined for the particular valuation method employed. Finally the amount of such an 'unfunded liability,' however defined for the method used, depends upon many assumptions made regarding future events such as size of work force, benefits, inflation, earnings on investments, etc. In other words *an 'unfunded liability' is simply a projection made by actuaries based upon assumptions regarding future events. No basis for any legally enforceable obligation arises until the events occur and when they do the amount of liability will be based on actual experience rather than the projections.*" (65 Ops.Cal.Atty.Gen., *supra*, at p. 574, italics added.) Such calculations did not result in a legally binding debt or liability, but instead provided "useful guidance in determining the contributions necessary to fund a pension system." (*Ibid.*)

■ We acknowledge that the Attorney General opinion is not binding, but it is entitled to considerable weight. (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1087, fn. 17 [103 Cal.Rptr.3d 767, 222 P.3d 214].) "Reliance on Attorney General opinions is particularly appropriate where, as here, no clear case authority exists, and the factual context of the opinions is closely parallel to that under review." (*Thorpe v. Long Beach Community College Dist.* (2000) 83 Cal.App.4th 655, 662–663 [99 Cal.Rptr.2d 897].) There is no clear case authority on this issue, and the 1982 opinion has a similar factual context involving the state's analogous debt limitation provision. We find the analysis in the 1982 opinion persuasive, and that analysis supports the conclusion that a UAAL such as the $100 million cited by the County in this case is an actuarial estimate projecting the impact of a change in a benefit plan, rather

than a legally enforceable obligation measured at the time of the County's 2001 resolution approving the 3% at 50 formula.

## C. *The County's arguments*

The County argues that pension obligations are incurred for the purposes of the debt limitation provision at the time of an award of pension benefits, citing *Carman v. Alvord* (1982) 31 Cal.3d 318 [182 Cal.Rptr. 506, 644 P.2d 192]. In *Carman*, a taxpayer argued that article XIII of the California Constitution (Proposition 13) prohibited a tax levied to meet a city's annual payment obligation to CalPERS. In determining that the city's 1978–1979 payment to CalPERS was "indebtedness as traditionally understood," the Court emphasized: " 'The term "indebtedness" has no rigid or fixed meaning, but rather must be construed in every case in accord with its context.' [Citations.] It can include all financial obligations arising from contract [citation], and it encompasses 'obligations which are yet to become due as [well as] those which are already matured.' " (*Carman*, at pp. 326–327.) This unexceptional statement does not control our case, which does not involve an annual payment to OCERS but rather a projection of what the past service portion of the enhanced benefit may cost the County, subject to all the variables inherent in projecting cost over time. In the context of this case, the actuarial projection is not "indebtedness as traditionally understood." (*Id.* at p. 327.) An unfunded liability such as a UAAL is not created at the time of the award of enhanced benefits, but occurs over years "and may have been avoided entirely if, for example, the retirement fund experienced better than expected investment returns . . . ." (*City of San Diego v. San Diego City Employees' Retirement System* (2010) 186 Cal.App.4th 69, 83 [111 Cal.Rptr.3d 418].)

None of the other debt-limitation cases cited by the County involves a factual situation similar to this case. (See *Chester v. Carmichael* (1921) 187 Cal. 287 [201 P. 925] [installment contract to purchase land for a county park]; *Mahoney v. San Francisco* (1927) 201 Cal. 248 [257 P. 49] [same]; *Garrett v. Swanton* (1932) 216 Cal. 220 [13 P.2d 725] [installment contract to purchase a water pumping plant], overruled in *City of Oxnard v. Dale* (1955) 45 Cal.2d 729, 737 [290 P.2d 859]; *In re City and County of San Francisco* (1925) 195 Cal. 426 [233 P. 965] [conditional purchase of land for city marina]; *City of Saratoga v. Huff* (1972) 24 Cal.App.3d 978 [101 Cal.Rptr. 32] [$2 million in special assessment bonds payable over 10-year period].) In each case, the obligation to repay the indebtedness was spread over years, but the total amount owed was not in question. Here, the County committed to paying increased benefits over time when it approved the enhanced benefit

for AOCDS members, but the UAAL is not a certain total for which the County is immediately liable.[7]

The County also cites an Attorney General opinion from 2005, which states: "A retroactive improvement in retirement benefits not only requires an increase in the city's future retirement contributions, but also creates a 'past service liability,' or debt to the retirement fund, which must be paid." (88 Ops.Cal.Atty.Gen. 165, 167 (2005).) That may be true as far as it goes, but the 2005 opinion did not address the municipal debt limitation and is not inconsistent with the earlier 1982 Attorney General opinion. The Attorney General in 1982 approvingly quoted an article in the state retirement system newsletter, which explained: " '[T]he *past service liability*" and the "unfunded liability" are a function of the actuarial methods and assumptions used to fund a pension plan. [¶] . . . [T]he "liabilities" are not owed by the plan. They are primarily a function of the methods and assumptions used by the actuary to fund the plan.' " (65 Ops.Cal.Atty.Gen., *supra*, at pp. 572–573, fn. 2, italics added.)[8]

---

[7] In *Starr v. City and County of San Francisco, supra*, 72 Cal.App.3d 164, the city financed a community center with a repayment agreement which, in addition to payments out of a special fund, required the city to make a lump-sum payment five years later out of the general fund. The city conceded that the potential lump-sum indebtedness was $14.1 million, but the court noted that the actual amount was "of unknown proportions." (*Id.* at pp. 170, 176.) This agreement to make a lump-sum final payment violated the requirement that an installment contract is valid only if the yearly payment is within the city's income and is supported by consideration in that year. (*Id.* at p. 172). The UAAL in this case is not a liability which the county has expressly agreed to pay in a lump sum in a future year.

The County also cites *In re County of Orange* (C.D.Cal. 1998) 31 F.Supp.2d 768, in which a federal district court concluded that "reverse repo transactions" were not transactions or loans for the purpose of the debt limitation provision. (*Id.* at p. 775.) The court emphasized, "The validity of a transaction, whether it creates indebtedness or liabilities, is measured at the time the transaction is entered into. [Citations.] . . . [¶] . . . [¶] . . . The Court looks to the economic substance of the transaction to determine whether excess indebtedness or liability has been incurred. [Citation.]" (*Id.* at pp. 776–777.)

[8] The full quoted text of the article in the 1982 opinion bears repeating: " 'Over the years, the term "unfunded liability" has created considerable confusion for the readers of actuarial reports. The confusion arises when the term is thought of in the same manner as accounting liabilities. That is, the connotation was that the money was "owed" by the plan or somehow the plan was deficient. The truth of the matter is that the "past service liability" and the "unfunded liability" are a function of the actuarial methods and assumptions used to fund a pension plan.

" 'The actuarial profession has been called upon on numerous occasions to explain these "liabilities"; however, the confusion continues to exist. In an attempt to clarify these values, the actuaries at PERS have adopted new terminology which, hopefully, will help resolve the question. In lieu of the previous term, the terms "actuarial liability" and "unfunded actuarial liability" [(UAAL)] will be used. These terms distinguish the liabilities presented from accounting liabilities. Remember, the "liabilities" are not owed by the plan. They are primarily a function of the methods and assumptions used by the actuary to fund the plan.' " (65 Ops.Cal.Atty.Gen., *supra*, at pp. 572–573, fn. 2.)

Nor do existing accounting standards support a conclusion that the UAAL was a legally enforceable obligation when the board of supervisors voted to adopt the enhanced benefit formula in 2001. As the amicus curiae brief in support of the County from the Accounting Professionals explains, the Governmental Accounting Standards Board (GASB) recognizes a pension "liability" as the difference between the government employer's *annual* pension cost and the employer's actual contributions to the pension plan. The GASB requires the "unfunded accrued benefit obligation" to be disclosed in notes to the financial statement, rather than reported on the balance sheet as a liability. (GASB, *Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans*, Statement No. 25 (1994) and GASB, *Accounting for Pensions by State and Local Governmental Employers*, Statement No. 27 (1994).)[9] While some pension liabilities must be reported on the balance sheet, the UAAL in this case is not one of them.

■ The County emphasizes its current difficult financial situation and the "ruinous fiscal irresponsibility" of the prior board of supervisors. Imprudence, however, is not unconstitutional. "Courts examining a potential violation of the Debt Limit are not directed to sit in *post hoc* judgment of the *wisdom* of a municipality's income and revenue estimates." (*In re County of Orange, supra*, 31 F.Supp.2d at p. 776.)

We affirm the trial court's grant of judgment on the pleadings on the municipal debt limitation cause of action in the second amended complaint.

## II.  *The prohibition against extra compensation*

Article XI, section 10, subdivision (a) of the California Constitution provides: "A local government body may not grant extra compensation or extra allowance to a public officer, public employee, or contractor after service has been rendered or a contract has been entered into and performed in whole or in part . . . ." The County alleged in its first amended complaint that the board of supervisors' approval of the past service portion of the 3% at 50 benefit enhancement granted extra compensation to AOCDS members employed by the County on June 28, 2002 (the effective date of the resolution), for services they had already rendered to the County, and this violated article XI, section 10.

---

[9] The Accounting Professionals also state that they agree with invited comments which support changing the GASB rules to require reporting the " 'unfunded accrued benefit obligation . . . on the face of the financial statements to measure the annual cost of pension benefits earned and the demands on future cash flows.' " This is simply a *suggested* change to *future* accounting standards, however, and does not support a conclusion that the board's action in 2001 created a liability under the then existing standards.

■ "Early decisions interpreting the extra compensation clause demonstrate that its framers had a particular, narrow objective in mind . . . . The primary purpose of the prohibition . . . was to prevent the Legislature from enacting 'private statutes' in recognition of 'individual claims.' . . . [T]he provision 'denied to the Legislature the right to make direct appropriations to *individuals* from general considerations of charity or gratitude, or because of some supposed moral obligation . . . .' " (*Jarvis v. Cory* (1980) 28 Cal.3d 562, 577 [170 Cal.Rptr. 11, 620 P.2d 598].) The prohibition on extra compensation does not apply to every grant of additional compensation for work already performed. In *Jarvis v. Cory*, a bill granting additional compensation to state employees for work performed during the fiscal year prior to the enactment of the statute did confer retroactive compensation. (*Id.* at p. 569.) Nevertheless, the Supreme Court concluded that "the extra compensation clause is not offended when state employees receive retroactive salary adjustments for periods during which they worked with justifiable uncertainty regarding their salary levels." (*Id.* at p. 579.)[10] The retroactive compensation served several public purposes, including the Legislature's finding that it was necessary " 'to ensure the continued recruitment and retention of qualified and competent state employees.' " (28 Cal.3d at p. 578, fn. 10; see *Theroux v. State of California* (1984) 152 Cal.App.3d 1, 6 [199 Cal.Rptr. 264].)

Similarly, the Third Appellate District held that pay adjustments made retroactive to the start of a county's fiscal year were not unconstitutional as a gift of public money[11] or as extra compensation, where an employee association and the county met and conferred to establish salary levels after the date of expiration of a salary ordinance. (*San Joaquin County Employees' Assn., Inc. v. County of San Joaquin* (1974) 39 Cal.App.3d 83, 88 [113 Cal.Rptr. 912] (*San Joaquin*).) "[I]n the area of employment, public agencies must compete, and if to so compete they grant benefits to employees for past services, they are not making a gift of public money but are taking self-serving steps to further the governmental agency's self-interest in recruiting the most competent employees in a highly competitive market." (*Id.* at pp. 87–88.)

Under very different circumstances, courts have found unconstitutional extra compensation taking a variety of forms: retroactive pay for overtime already worked (*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 27 [157 Cal.Rptr. 706, 598 P.2d 866]; *Martin v. Henderson* (1953) 40 Cal.2d 583, 590–591 [255 P.2d 416]), lump-sum payment for accumulated unused vacation not authorized when work was performed (*Seymour v. Christiansen*

---

[10] Those salary levels had been rendered uncertain by events surrounding the enactment of Proposition 13, which events included alterations in state employees' salary levels and uncertainty about possible salary freezes. (*Jarvis v. Cory, supra,* 28 Cal.3d at pp. 574–576.)

[11] The County's first amended complaint did not contain an allegation that the retroactive portion of the 3% at 50 formula was a gift of public money in violation of article XVI, section 6 of the California Constitution.

(1991) 235 Cal.App.3d 1168, 1178–1179 [1 Cal.Rptr.2d 257]), and retroactive payment for overtime or work on holidays (*Jarvis v. Henderson* (1953) 40 Cal.2d 600, 607 [255 P.2d 426]). Courts have also invalidated pension benefits which did not vest because they were conferred by mistake. (*Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864, 871–872 [5 Cal.Rptr.3d 634] [no vested right to safety member pension when employees were erroneously classified as safety members]; *Crumpler v. Board of Administration* (1973) 32 Cal.App.3d 567, 585–586 [108 Cal.Rptr. 293] [same; "correction of an erroneous classification cannot be equated to a modification or alteration of earned pension rights"].) No court, however, has found that changes to pension benefits awarded for past service to employees with already vested pension rights are unconstitutional extra compensation.

### A. *Vested pension rights*

██ "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity. [Citation.]" (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863 [148 Cal.Rptr. 158, 582 P.2d 614].) Before retirement, the employee does not have "any absolute right to fixed or specific benefits, but only to a 'substantial or reasonable pension.' " (*Ibid.*)

██ "[P]ension laws are to be liberally construed to protect pensioners and their dependents from economic insecurity. [Citation.] Unlike other terms of public employment, which are wholly a matter of statute, pension rights are obligations protected by the contract clause of the federal and state Constitutions. [Citations.] . . . [¶] . . . As the Supreme Court notes, 'upon acceptance of public employment [one] acquire[s] a vested right to a pension *based on the system then in effect.*' [Citations.]" (*United Firefighters of Los Angeles City v. City of Los Angeles* (1989) 210 Cal.App.3d 1095, 1102 [259 Cal.Rptr. 65], quoting *Miller v. State of California* (1977) 18 Cal.3d 808, 817 [135 Cal.Rptr. 386, 557 P.2d 970] (*Miller*).) Nevertheless, "pension rights are not immutable." (*Miller, supra,* 18 Cal.3d at p. 816.) A government entity may make " 'reasonable modifications and changes before the pension becomes payable . . . .' " (*Ibid.*) Any subsequent modification to vested pension rights must be reasonable based on the facts of each case, and " 'changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.' " (*Ibid.*) " 'The saving of public employer money is not an illicit purpose if changes in the pension program are accompanied by comparable new advantages to the employee.' " (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1145 [61 Cal.Rptr.2d 207].) Therefore, "[a]n employee's contractual pension expectations are

measured by benefits which are in effect not only when employment commences, but which are thereafter conferred during the employee's subsequent tenure." (*Betts v. Board of Administration, supra,* 21 Cal.3d at p. 866; see *United Firefighters of Los Angeles City v. City of Los Angeles, supra,* 210 Cal.App.3d at p. 1102, fn. 3; *Thorning v. Hollister School Dist.* (1992) 11 Cal.App.4th 1598, 1606 [15 Cal.Rptr.2d 91].)

The County argues, however, that the general rule that current employees have a vested right to increases in pension benefits conferred during employment does not govern this case. Although 3% of 50 is an enhanced pension benefit conferred during the tenure of AOCDS employees working for the County on June 28, 2002, the County argues that the new benefit formula did not vest as to service before that date, because the past service portion of the enhanced benefit is prohibited extra compensation. Case law stands in the County's way.

### B. *Extra compensation and pensions*

#### 1. *Sweesy*

In *Sweesy v. L. A. etc. Retirement Bd.* (1941) 17 Cal.2d 356 [110 P.2d 37] (*Sweesy*), the widow of a police officer who retired in 1935 and had died in 1939, applied for a widow's pension that had been authorized by legislation in 1937, after her husband had retired but before he died. The legislation specifically provided "that its provisions shall be retroactive as to the past service of any member who shall be entitled to the benefits 'contained herein.' " (*Id.* at p. 359.) The retirement board argued that the amendment should only apply prospectively, to surviving widows of pensioners who were in active service at the time of the adoption of the legislation, because otherwise it would be unconstitutional as a gift of public money.[12] The board also argued that the retroactivity provision referred only to the past service of members on active duty at the time of the amendment, as distinguished from members who had already retired. (*Sweesy,* at p. 359.)

The Supreme Court observed: " 'A pension is a gratuity only where it is granted for services previously rendered which at the time they were rendered gave rise to no legal obligation . . . [.] But where, as here, services are rendered under a pension statute, the pension provisions become a part of

---

[12] When *Sweesy, supra,* 17 Cal.2d 356 was decided in 1941, the California Constitution did not prohibit extra compensation to public employees; the "public employee" language in article XI, section 10, subdivision (a) was added in 1970. (*Longshore v. County of Ventura, supra,* 25 Cal.3d at p. 23.) Gifts of public money violate California Constitution, article XVI, section 6. (*Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199, 207 [56 Cal.Rptr.2d 732].)

the contemplated compensation for those services and so in a sense a part of the contract of employment itself.' " (*Sweesy, supra,* 17 Cal.2d at pp. 359–360.) The court concluded that it was "the settled law of this state that unless the contrary intention plainly appears persons having a pensionable status are entitled to receive any increase of benefits which may be provided." (*Id.* at p. 361.) The police officer's "pension rights vested at the time he was retired from service";[13] he "had a status as a pensioner at the time of the adoption of the amendment . . . [whose] provisions were made expressly retroactive so as to include past service of any member entitled to the benefits 'contained herein.' Unquestionably [he] was a member entitled to the benefits of the system. No distinction is made by the legislature between members in active duty on full pay and those on retirement, in so far as the retroactive provisions are concerned, and no distinction may here be drawn on that basis. Therefore, the provisions must be held to apply to members who had a vested [right] as well as to those [(such as the widow)] who merely had an inchoate right to members' pension benefits at the time of the adoption of the amendment." (*Sweesy,* at p. 361.)

The Supreme Court also rejected the contention that the retroactive benefit was additional compensation: "The problem cannot be solved merely by stating as a proposition that a provision will not be upheld which purports to grant a pension after the completion of the services for which the pension is contemplated as additional compensation. The law is well settled that additional benefits may constitutionally be provided for members of the system who have acquired a pensionable status. . . . There is some language in the decisions which refers to pension benefits as additional or increased compensation for services performed and to be performed. [Citations.] But that designation may not be strictly accurate in every case. As in this case, the members of the system make contributions to the pension fund, even though contributions may also come from public funds. Such systems are usually founded on actuarial calculations. Therefore, the question of what benefits would be warranted by either the individual or mass contributions to the fund is for the legislative body, and not for the pension board or the courts, whose respective functions in such cases are to administer and interpret the provisions of the law as written." (*Sweesy, supra,* 17 Cal.2d at pp. 361–362.) The court added that "the provision for pension to members' widows benefits all members, whether on active or retired duty; but as to any prospective grantee of the pension it is an inchoate right which may be taken away at any time

[13] The Supreme Court later noted, in a case discussing *Sweesy, supra,* 17 Cal.2d 356, that as to employees "[i]nsofar as the *time* of vesting is concerned, there is little reason to make a distinction between the periods before and after the pension payments are due," and an employee "has actually earned some pension rights as soon as he has performed substantial services for his employer." (*Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 855 [179 P.2d 799].)

before it becomes vested in her [(the widow)]." (*Id.* at p. 362.) "[I]ncreased benefits to one already having a pensionable status are constitutional and economically appropriate." (*Id.* at p. 363.)

In *Sweesy, supra,* 17 Cal.2d 356, the Supreme Court approved the retroactive application of an increased pension benefit to the widow of a police officer who had retired before the amendment authorizing the additional benefit was enacted. Although the police officer had already retired, the Legislature had not distinguished between retired and active members, and the court declined to draw any distinction between those active members on full pay and those in retirement.

### 2. *Nelson*

In *Nelson v. City of Los Angeles* (1971) 21 Cal.App.3d 916 [98 Cal.Rptr. 892] (*Nelson*), the petitioners were a member of the police department who had retired in 1947 and the widow of a member who died while employed in 1948. Both were receiving pensions from the city in 1971, when the city adopted a charter amendment increasing the minimum pension payable and raising the annual cost of living increases from 2 to 3 percent. (*Id.* at p. 917.) The "narrow issue" was "is an increase in [pension] benefits payable to a city pensioner extra compensation or an extra allowance prohibited by article XI, section 10? We conclude that it is not." (*Id.* at p. 918.)

"[A]n increase in benefits to persons occupying a pensionable status is not to be treated as the payment of 'extra compensation or allowance,' as those terms are used in the proscription of article XI, section 10." (*Nelson, supra,* 21 Cal.App.3d at p. 918.) Quoting *Sweesy, supra,* 17 Cal.2d 356 for its holding that such an increase was not a gift of public funds and citing *Jorgensen v. Cranston* (1962) 211 Cal.App.2d 292, 295 [27 Cal.Rptr. 297] (disapproved on other grounds in *Olson v. Cory* (1983) 35 Cal.3d 390, 406 [197 Cal.Rptr. 843, 673 P.2d 720]) for the rule that a similar increase was not extra compensation, the court concluded: "Uniform precedent thus leads us to the conclusion that the increases in pension benefits granted to persons in a pensionable status[14] by the 1971 amendments to the Los Angeles City Charter are not proscribed by California Constitution, article XI, section 10." (*Nelson, supra,* 21 Cal.App.3d at pp. 919–920.)

---

[14] "The words 'pensionable status' although not precisely defined . . . in *Sweesy*[, *supra,* 17 Cal.2d 356] . . . were intended by the courts using this language to encompass the expectation in the public officer or employee and his spouse that if the former (the 'breadwinner') continues faithfully in his governmental position until his death or eligible retirement, his widow upon his death will receive not only the pension benefits then provided by the retirement system but any benefits which the Legislature, in its discretion, may thereafter provide to then active judges for the benefit of *their* spouses, in view of changing conditions and circumstances in the economic world." (*Jorgensen v. Cranston, supra,* 211 Cal.App.2d at p. 298.)

### 3. *American River*

In *American River Fire Protection Dist. v. Brennan* (1997) 58 Cal.App.4th 20 [67 Cal.Rptr.2d 660] (*American River*), the district sued to recover payments it had made to firefighters upon retirement for portions of accrued but unused sick leave. Before November 1, 1988, the memorandum of understanding between the district and the firefighters' union provided that upon retirement, accrued but unused sick leave would convert to additional service credit. Effective November 1, 1988, the memorandum provided that employees had the option to elect to receive pay for up to one-half of unused sick leave; the remainder would become service credit upon retirement. (*Id.* at p. 22.) After several firefighters retired and were paid by the district for sick leave accrued before November 1988, counsel for the district opined that the sick leave buy-out program was unconstitutional as applied to any sick leave accrued before the November 1, 1988 effective date of the program. Although the district conceded that the intent of the negotiators was that the sick leave buyout be retroactive, the district asked the firefighters to repay the amounts paid for their accrued sick leave, and indicated that it would file a legal action if they did not comply. (*Id.* at pp. 22–23.) The district did file a complaint, and the trial court granted summary adjudication, finding that the payments for sick leave accrued before November 1, 1988, were unconstitutional. (*Id.* at p. 24.)

The court of appeal noted, "[e]arly decisions interpreting the extra compensation clause found its framers had a narrow intention to prohibit government appropriations motivated by charity or gratitude," responding to legislative abuses in enacting private statutes to address individual claims. (*American River, supra*, 58 Cal.App.4th at p. 24, citing *Jarvis v. Cory, supra*, 28 Cal.3d at p. 577.) In this case, the sick leave was a negotiated benefit, and public agencies had to compete with private employers who offered not only salaries but sick leave, vacations, and other benefits. (*American River*, at pp. 24–25, quoting *San Joaquin, supra*, 39 Cal.App.3d at pp. 87–88.) The court discussed the cases cited above regarding retroactive compensation for overtime and vacation time, which the district considered dispositive, and pointed out that although sick leave "as such" was a benefit that provided compensation during employment, "upon retirement unused sick leave became a component in calculating the employee's pension benefit." (*American River*, at p. 27.) "The sick leave buyout provision applied only to retiring firefighters. It continued the long-standing policy of granting additional benefits at retirement to firefighters with accrued sick leave. There was no right to a cash payment for unused sick leave simply upon separation from service. This limited application shows the sick leave buyout was not extra compensation; it added an alternative to established pension benefits and perhaps an incentive to retire." (*Ibid.*)

In a paragraph with direct application to this case, the court stated: "The District acknowledges that the extra compensation clause does not apply to pension benefits. 'If this creates an anomaly in the law, it is one sanctioned by the California Supreme Court.' (*United Firefighters of Los Angeles City* v. *City of Los Angeles*[, *supra*,] 210 Cal.App.3d [at p.] 1105 . . . .) The right to pension benefits vests upon the acceptance of employment. (*Miller* v. *State of California, supra*, 18 Cal.3d at p. 815.) An increase in pension benefits even after retirement is not extra compensation as that term is used in article XI, section 10 of the California Constitution. (*Nelson* v. *City of Los Angeles*[, *supra*,] 21 Cal.App.3d [at p.] 918 . . . .)" (*American River, supra*, 58 Cal.App.4th at pp. 27–28.) After describing the facts in *Nelson*, the court quoted the opinion: " '[A]n increase in pension benefits payable to a retired public employee or his widow on pensionable status is paid as the result of rights incident to that status and not as a matter of increased compensation or allowance.' [Citation.] [¶] Here, rather than increasing the pension benefit, the buyout program provided an alternative that would result in increased benefits upon retirement for some firefighters. This increased benefit is payable due to their status at retirement, not as extra compensation for work already performed." (*Id.* at p. 28.)

The *American River* court rejected the district's argument that permitting the retroactive buyout would "eviscerate" the prohibition against extra compensation and "lead to rampant abuses in pension programs." (*American River, supra*, 58 Cal.App.4th at p. 28.) The firefighters always received some benefit (increased service credit) from unused sick leave upon retirement, and therefore there was a prior authorization for this type of benefit, which resulted in increased benefits upon retirement for some employees. "[T]he extra compensation clause retains its vitality to preclude granting new benefits retroactively for services previously rendered." (*Ibid.*) The enhanced sick leave policy "merely substituted a cash benefit at retirement for an increased pension, [and] did not result in extra compensation prohibited by article XI, section 10, subdivision (a) of the California Constitution." (*Ibid.*)

### 4. *Application to this case*

We describe the preceding cases in detail because they show the progression of the law in this area. We continue the progression, and conclude that the past service portion of the 3% at 50 enhanced pension benefit formula for AOCDS members is not unconstitutional extra compensation.

The pension rights of AOCDS members employed on June 28, 2002, vested when they accepted public employment. (*Miller, supra*, 18 Cal.3d at p. 817.) The vested rights are not immutable. (*Id.* at p. 816.) The County may make reasonable changes to a pension plan before the pension becomes

payable, so long as any disadvantages to the employees are accompanied by comparable new advantages. (*Ibid.*) The AOCDS members' contractual pension expectations include not only those benefits in effect when they accepted employment, but also those conferred during their tenure. (*Betts v. Board of Administration, supra,* 21 Cal.3d at p. 866.) Therefore, when the County Board of Supervisors approved the increase to 3% at 50 to take effect on June 28, 2002, the vested rights of AOCDS members employed on that date included the enhanced pension benefit formula, which was conferred during their employment.

The resolution adopting 3% at 50 specifically provided that the enhancement applied to all years of service, including years worked before June 28, 2002. This retroactive application also became part of the contract of employment of all AOCDS members. (*Sweesy, supra,* 17 Cal.2d at pp. 359–360.) The increased benefits were not extra compensation. (*Id.* at p. 363; *Nelson, supra,* 21 Cal.App.3d at p. 918.) The 3% at 50 enhancement did not provide AOCDS members with additional compensation while they worked for the County. Rather, it would become part of the calculation of the employees' pension benefits upon retirement. (*American River, supra,* 58 Cal.App.4th at p. 27.) The 3% at 50 resulted in increased benefits upon retirement, but was not additional compensation. (*Id.* at p. 28.) Instead, it altered the prior pension benefits and perhaps provided an incentive to retire. (*Id.* at p. 27.)

The County argues that *Sweesy* and *Nelson* are not applicable because those cases involved retroactive benefits awarded to already retired employees rather than active employees. (Under § 31678.2, subd. (c), the past service portion of the enhanced benefit formula at issue in this case did not apply to AOCDS members who had already retired.) Although the County argues that there is a "clear distinction between retirees and current employees," that distinction is one the Supreme Court in *Sweesy* declined to draw. The retirement board argued that the new widow's pension benefit applied not to retirees but only to current employees, but the court noted that the legislation did not draw a distinction between members in active duty and retired members, "and no distinction may here be drawn on that basis." (*Sweesy, supra,* 17 Cal.2d at p. 361.) Given that the right to pension benefits vests at the time of employment, the current employees in this case are in a similar situation to the retired employees in *Sweesy* and *Nelson.* In *Nelson,* the petitioners were retired employees, but the city argued that the charter amendment increasing pension benefits applied only to those persons not yet retired on the date of the amendment. (*Nelson, supra,* 21 Cal.App.3d at p. 918.) Although the County argues that article XI, section 10 of the

California Constitution only mentions "public employees," not retirees, *Nelson* did not hesitate to apply that section to retired public employees.[15]

The County further argues that the statement in *American River, supra*, 58 Cal.App.4th at page 27 that "the extra compensation clause does not apply to pension benefits" is dictum. We do not depend upon that general statement, however, but upon a careful analysis of the facts and law in *Sweesy*, *Nelson*, and *American River*. That analysis leads us to the conclusion that the first amended complaint in this case does not state a claim that the past service portion of the 3% at 50 formula violates the extra compensation clause. We affirm the trial court's grant of judgment on the pleadings on the extra compensation cause of action in the first amended complaint.

### C. *Section 31678.2*

Section 31678.2, subdivision (a) of CERL specifically authorizes past service pension benefit increases, providing "a board of supervisors . . . may, by resolution adopted by majority vote, make any section of this chapter prescribing a formula for calculation of retirement benefits applicable to service credit earned on and after the date specified in the resolution, which date may be earlier than the date the resolution is offered." Subdivision (c) provides that such a benefit for past service "shall only be applicable to members who retire on or after the effective date of the resolution described in subdivision (a)." "Before 2000, the Legislature expressly prohibited a county from providing increased pension benefits on a retroactive basis. (§ 31678.) However, in 2000, the Legislature adopted a broad exception to this rule, specifically providing counties with the option of applying an improved benefit formula in a retroactive manner." (*San Diego County Employees Retirement Assn. v. County of San Diego* (2007) 151 Cal.App.4th 1163, 1175 [60 Cal.Rptr.3d 601].) "The statute does, however, contain an express limitation that counties may not offer the retroactive benefit to employees who retired before the effective date of the resolution." (*Id.* at p. 1176.)

The County Board of Supervisors adopted resolution No. 01-410 in December 2001, authorizing the 3% at 50 formula for "all years of service" by AOCDS members employed by the County on June 28, 2002. The resolution complies with the statute: a majority (unanimous) vote of the board of supervisors made the enhanced formula applicable to all years of service,

---

[15] We also note that the County's argument that the past service portion of the enhancement is extra compensation would logically seem to apply with more force to employees who had already retired on June 28, 2002. In any event, section 31678.2, subdivision (c) provides that the statute does not apply to employees retired at the time of a resolution changing the retirement formula.

as authorized by section 31678.2, subdivision (a) ("the date specified in the resolution . . . may be earlier than the date the resolution is adopted"). The limitation of the enhanced benefit formula to employees who had not retired before June 28, 2002, was in compliance with section 31678.2, subdivision (c), which provides: "This section shall only be applicable to members who retire on or after the effective date of the resolution described in subdivision (a)." The County Board of Supervisors in 2001 did precisely what section 31678.2 authorizes.

The County's present argument—that applying increases in pension benefits for current employees to their past service violates the extra compensation clause—necessarily also contemplates that section 31678.2 authorizes unconstitutional actions by a board of supervisors or governing body. The County ignores the obvious implications of its extra compensation argument, neglecting to address the constitutionality of section 31678.2 in its reply brief, although the brief by respondent OCERS discusses the section at length. The County continues its silence on the issue in its response to the amicus curiae brief from CalPERS, which points out that the County fails to acknowledge the implications of its arguments for statutes which allow increased pension benefits for state employees to be applied to prior years of service.[16]

Our conclusion that applying the 3% at 50 formula to past service does not violate article XI, section 10 of the California Constitution's prohibition of extra compensation makes it unnecessary for us to address the constitutionality of section 31678.2, or the other, wider implications of the County's argument. Nevertheless, we note that this case involved the collective bargaining process, in which AOCDS bargained with the County for the past service application of the 3% at 50 formula. "The legislative history underlying section 31678.2 . . . show[s] that the supporters of this legislation were seeking to provide counties with ' "maximum local control" ' in determining the appropriate retirement formula and to require the counties to engage in collective bargaining on the retroactive benefit issue. [Citations.] These objectives are consistent with a conclusion that the Legislature intended to provide the counties with broad discretion in deciding the manner in which to apply this optional retroactive benefit." (*San Diego County Employees Retirement Assn. v. County of San Diego, supra*, 151 Cal.App.4th at p. 1176.) The County exercised its discretion, as authorized by the statute, when after collective bargaining the board of supervisors approved the resolution authorizing 3% at 50 for all years of service for AOCDS members employed on June 28, 2002.

---

[16] CalPERS points to numerous legislative authorizations allowing pension benefits to be calculated based on state employees' past service, and concludes "including prior years of public service to calculate benefits has been a fundament[al] part of public employees' pension benefits for at least the past 97 years."

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

Mallano, P. J., and Chaney, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 13, 2011, S191218.