Filed 1/20/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| IMPERIAL COUNTY SHERIFF'S ASSOCIATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF IMPERIAL et al., <br><br> Defendants and Respondents. | D079274 <br><br><br> (Super. Ct. No. ECU000786) |

APPEAL from an order of the Superior Court of Imperial County, Jeffrey Bruce Jones, Judge. Reversed and remanded with directions.

Mastagni Holstedt, David E. Mastagni, Nathan Senderovich and Melissa M. Thom for Plaintiffs and Appellants.

Hanson Bridgett, Raymond F. Lynch, Adam W. Hofmann and Matthew J. Peck for Defendant and Respondent County of Imperial.

Olson Remcho, Christopher W. Waddell, Deborah B. Caplan and Benjamin N. Gevercer for Defendants and Respondents Imperial County Employees' Retirement System and Board of the Imperial County Employees' Retirement System.

Plaintiffs, six individuals employed by the County of Imperial, and the three unions representing them (the Imperial County Sheriff's Association (ICSA), the Imperial County Firefighter's Association (ICFA), and the Imperial County Probation and Corrections Peace Officers' Association (PCPOA)), brought a class action lawsuit against the County of Imperial, the Imperial County Employees' Retirement System, and the System's Board alleging that the defendants were systematically miscalculating employee pension contributions.

After two years of failed mediation, the plaintiffs filed a motion for class certification under Code of Civil Procedure section 382. The trial court denied the motion, finding that the conflicting interests of two primary groups of employees, those hired before the effective date of the Public Employee Pension Reform Act (Gov. Code, § 7522, et seq.[1], PEPRA) and those hired after, precluded the court from certifying a class. The court found that because the employees hired before PEPRA took effect were entitled to an enhanced pension benefit unavailable to those hired after, the two groups' interests were antagonistic and the community of interest among the proposed class members required for certification could not be met. The trial court also concluded the proposed class representatives had failed to show they could adequately represent the class.

On appeal from that order, the plaintiffs contend that insufficient evidence supports the trial court's finding that there was an inherent conflict among the class members that precluded class certification and that the court's legal reasoning on this factor was flawed. The plaintiffs also argue

---

[1] Subsequent undesignated statutory references are to the Government Code.

they should have been afforded an opportunity to show they can adequately represent the interests of the class.

As we shall explain, we disagree with the trial court's reasoning concerning the community of interest among the proposed class and agree with the plaintiffs they should be provided an opportunity to demonstrate their adequacy. Accordingly, we reverse the order denying class certification and remand the matter to the trial court with directions to allow the proposed class representatives to file supplemental declarations addressing their adequacy to serve in this role. Thereafter, if the trial court approves of the class representatives, the court is directed to grant the plaintiffs' motion for class certification, including the creation of the subclasses identified in this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Structure and Governance of the Imperial County Retirement System*

To understand the contours of the dispute, some background concerning the pension system at issue is necessary. Imperial County (County) is governed by a Board of Supervisors consisting of five elected members. The Board of Supervisors possesses the exclusive legal authority to provide for the compensation of its employees and must exercise that authority by ordinance or resolution. (§ 25300; Cal. Const., art. XI, § 1, subd. (b).) This authority includes the provision of retirement benefits to county employees. Under this authority, the County established the Imperial County Employees' Retirement System (ICERS), which operates under the County Employee Retirement Law of 1937 (§ 31450, et seq.; CERL). (§ 31500; *Alameda County Deputy Sheriff's Association v. Alameda County Employees' Retirement Association* (2020) 9 Cal.5th 1032, 1066.)

3

ICERS, in turn, is administered by its own board, the ICERS Board of Retirements (ICERS Board), which possesses "the sole and exclusive fiduciary responsibility over the assets of" ICERS and the "sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries." (Cal. Const., art. XVI, § 17, subd. (a).) In addition, the ICERS Board " 'has "the sole and exclusive power to provide for actuarial services in order to assure the competency of the assets of the public pension or retirement system." (Cal. Const., art. XVI, § 17, subds. (a), (e).)' " (*Mijares v. Orange County Employees' Retirement System* (2019) 32 Cal.App.5th 316, 323 (*Mijares*).)

The goal of defined benefit, public pension plans, like ICERS, is to ensure payment of all vested, promised benefits to members, both those currently retired and those who will retire in the future. (Cal. Const., art. XVI, § 17, subd. (a); *Mijares, supra*, 32 Cal.App.5th at p. 331.) Under CERL, the employee's fixed periodic payment is based on "the employee's accumulated contributions supplemented by a pension established with county contributions sufficient to equal a specified fraction of the employee's 'final compensation.' " (*Ventura County Deputy Sheriff's Assn. v. Bd. of Retirement* (1997) 16 Cal.4th 483, 490.) The fixed retirement benefits are funded from three sources: employer contributions, employee contributions, and investment earnings and appreciation on the system's trust fund. (79 Ops.Cal.Atty.Gen. 95, 96 (1996).)

The ICERS Board has the power and fiduciary duty to retain an actuary to ensure the actuarial sufficiency of these three sources of funding can pay the promised pension benefits when due. (Cal. Const., art. XVI, § 17, subd. (e).) Under CERL, the ICERS Board is required to conduct regular

4

actuarial evaluations to determine whether the system's assets and contributions are sufficient to cover the costs of providing the promised pension benefits, establish the employer and employee contributions necessary to fund the retirement benefits of County employees, and to "determine the extent to which prior assumptions must be changed." (*In re Retirement Cases* (2003) 110 Cal.App.4th 426, 459–460.)

Two types of costs must be paid each year to fund the system retirement benefits of County employees:  normal cost and the amortized payment of the unfunded actuarial accrued liability (UAAL).  Normal cost is the amount projected to be needed to pay retirement benefits for services rendered by active members for the current year.  The UAAL constitutes the difference between the actuarial accrued liability—the difference between the projected normal cost and the actual cost of benefits—and the actuarial value of system assets.  (*County of Orange v. Assn. of Orange County Deputy Sheriffs* (2011) 192 Cal.App.4th 21, 34–35 (*County of Orange*).)  UAAL can result from lower than expected investment returns on system assets, longer than expected lifespans, and changes in contributions or benefits.  For this reason, changes in contributions or benefits impact system assets and liabilities, potentially impacting all members.  (*Ibid*.)

Based on the actuarial evaluations, the ICERS Board annually recommends the normal cost and UAAL contribution rates, expressed as a percentage of payroll, for the County and its employees.  (§§ 31453, 31453.5, 31553.6.)  The normal cost contribution pays the normal cost and the UAAL contribution amortizes the system's UAAL over a set period.  (§ 31453.5.)  Once the normal cost and UAAL contribution rates are determined and communicated to the County, the County Board is then statutorily obligated

to implement the contribution rates recommended by the ICERS Board. (§ 31454, subd. (a).)

2. *Enhanced Benefit for Safety Members Under the 2001 MOU*

ICERS divides its members into two categories, "safety" and "non-safety" or "general" members. Safety members are County employees whose duties consist of active law enforcement and fire suppression, and certain probation officers. Non-safety/general members are all other employees. Members in each category receive different benefits and are subject to different contribution rate schemes. (§§ 31453, 31454, 31584, 31620–31631.5, 31639–31639.95, 31662–31664.5, 31670–31683.)

ICERS safety members are represented by three unions, plaintiffs ICSA, ICFA, and PCPOA. Under the Government Code, the County must meet and confer with the unions regarding their members' wages, hours, and other terms and conditions of employment. (§ 3505.) If the meetings result in an agreement, the parties to that agreement prepare a written memorandum of understanding (MOU), that must be approved by the unions' membership and the County Board. If the MOU is approved, it becomes binding. (§ 3505.1.)

"The benefits that an employee receives upon retirement are calculated according to a statutory formula that takes into account the employee's final compensation, the number of credited years of service the employee had with the County, and a statutory multiplier. CERL provides for a variety of possible formulas for safety members." (*County of Orange, supra*, 192 Cal.App.4th at p. 29, fn. omitted.) In 2000, the California Legislature enacted section 31664.1, which "provide[d] for an 'additional pension for safety members,' commonly called the "3% at 50" formula, which [provided for] three percent of final compensation, multiplied by the number of service

6

years, for employees retiring at the age of 50. (§ 31664.1, subd. (b).)" (*Ibid*.) As a result of this change, in 2001, the County adopted Resolution 2001-76 approving MOUs with the unions representing ICERS safety members that provided for the enhanced retirement benefit.

According to ICERS, at the time of the agreements its system "was nearly fully funded and there was no outstanding unfunded liability." The adoption of the enhanced benefit, however, "created a new unfunded liability." With respect to funding of this new liability, the resolution provided that ICERS would contribute $4,914,844 and up to an additional $1.7 million for the unfunded liability. In addition, the resolution stated that "all safety members who are required to contribute to safety retirement shall pay for any additional contributions due from both the County and the safety member as a result of the enactment of this resolution on or after the effective date of this resolution (currently about 3.63%), to be adjusted at each subsequent actuarial study with rates set by the Board of Retirement and to include any increases in the amount of the contributions of the safety member and/or the County thereafter."

Likewise, the two underlying MOUs contained language addressing the funding of the new liability. The first provided: "The unfunded liability for this benefit which will result to the retirement fund because increased contributions have not been … paid into the fund on behalf of … safety members will be paid for by the Retirement Board. Safety members would then pay the total prospective increased cost of this benefit. The current increased cost is an added 3.63% of payroll increase in each individual employee's retirement contributions per month." (Italics omitted.)

The second stated: "Adoption of the resolution … shall also be conditioned upon all safety members paying the full additional contributions

7

of both the County and the safety member of the 3% at 50 benefit on or after the effective date [of] said resolution, including any increases in the contributions of the safety member and/or the County thereafter. … [¶] Safety members shall not be required to pay any estimated unfunded liability for the 3% at 50 benefit which accrued prior to the effective date of the resolution whether known or unknown by the County. [¶] By executing this Agreement, safety members waive any right or entitlement they might otherwise have had to payment by the County of any increased employer costs for the 3% at 50 benefit." (Italics omitted.)

ICERS asserts these provisions were intended to require it would absorb the costs of unfunded liability for the time period before the resolution was adopted, but that the provisions did not specifically address post-agreement unfunded liability created by the enhanced benefit, "except to state that the [s]afety members would pay the 'total' costs going forward, including any increased employee *and County* contributions attributable to this benefit." The County maintains that under this agreement, the safety member unions agreed that "as a condition of the County Board's approval of the Enhanced Benefit, '*all Safety Members*' would pay the normal and UAAL cost contributions attributable to the difference between the cost of the Regular Benefit and the Enhanced Benefit.

After the adoption of the enhanced benefits for the plaintiff unions and their members, the County and the unions entered into subsequent MOUs continuing the cost-sharing agreement set forth in the 2001 MOUs. Those agreements called for the safety members to pay the "increased contribution" to fund the enhanced benefit.

8

## 3. *Enactment of PEPRA*

When the U.S. economy went into recession in 2007, retirement systems, including ICERS, were impacted. In response to weaknesses in the state's retirement programs revealed by the economic downturn, the Legislature enacted the Public Employees' Pension Reform Act (§§ 7522-7522.74, PEPRA), which went into effect in 2013. PEPRA limited benefits in various ways, including prohibiting retirement systems from offering the 3% at age 50 benefit to employees after the law's effective date. (§ 7522.02, subd. (c)(1).) The new law capped new safety members' benefits (which we refer to as PEPRA members) at a formula of 2.7% at age 57, and required members to pay at least 50% of the normal cost of their retirement benefit. (§§ 7522.25, 7522.30.)

According to ICERS, before and after the passage of PEPRA, the unfunded liability attributable to the enhanced benefit for safety members continued to grow. During this time both those safety members eligible for the 3% at 50 benefit (Legacy members) and PEPRA members "were assessed a pro-rata share of the UAAL cost associated" with that enhanced benefit. Beginning in 2019, through MOUs ratified by the County, the County "agreed to pay the UAAL cost for PEPRA members" while Legacy members were "required to continue to pay for the UAAL cost associated with the benefit."

## 4. *Present Litigation*

Before the 2019 MOUs were entered, on February 25, 2019, plaintiffs filed their complaint for declaratory and injunctive relief and petition for writ of mandate initiating this action. The complaint sought certification of a class of individuals employed by the County and who were members of ICERS presently or at any time in the prior four years. The complaint also proposed two subclasses, (1) individuals who became members of ICERS prior

to the effective date of PEPRA, January 1, 2013, the Legacy members, and (2) individuals who became members after that date, the PEPRA members.

As the factual basis for its claims—for declaratory relief, mandamus, and violation of the equal protection clauses of the California and U.S. constitutions—the plaintiffs' complaint alleges the County and ICERS, including through the MOUs with the unions and their members, improperly charged ICERS members for UAAL costs associated with the enhanced benefit. Further, the complaint alleges that ICERS improperly imposed the UAAL costs of the enhanced benefit on *all* safety members of ICERS, not just those Legacy members eligible for the benefit, in violation of PEPRA.

For example, the claim for declaratory relief asserts the County and ICERS's "imposition of the UAAL rate on [PEPRA members] constitutes imposing a retirement cost-share percentage of greater than 50% of total normal costs" in violation of PEPRA. Similarly, the plaintiffs assert that ICERS and the County imposed costs of the UAAL related to the enhanced benefit on PEPRA members in violation of their equal protection rights. In their claim for mandamus relief, the plaintiffs assert that Legacy members were also required to contribute greater amounts than they bargained for in the MOUs and that such contributions were in violation of section 31631.5.

After attempts at settlement failed, the plaintiffs brought the present motion to certify a class comprised of: "All individuals who are employed by Respondent County of Imperial and are members of ICERS, or who were employed by Respondent County of Imperial and were members of ICERS at any time four years prior to the filing of Petitioners' complaint through the date of a signed order certifying this class." The motion did not specifically request subclasses of Legacy and PEPRA members, but such subclasses were

identified and requested in the petition and complaint. Plaintiffs also requested the appointment of Mastagni Holstedt APC as class counsel.

The County opposed the motion for class certification. It argued that the motion should be denied because the plaintiffs failed to provide sufficient evidence to demonstrate the requirements for class certification were met. The County argued that because the motion attached no declarations from the proposed class representatives, and was supported only by a declaration from Counsel attesting that, "on information and belief," each of the class certification requirements were met, denial of the motion was required.

Additionally, the County argued the plaintiffs could not satisfy the community of interest requirement for certification because (1) the proposed class representatives lacked standing to represent general, or non-safety, members who receive different benefits; (2) irreconcilable conflicts existed between the interests of Legacy and PEPRA members; (3) irreconcilable conflicts existed between active and retired members of ICERS because retired members no longer contribute to fund their benefits, whereas active-employee members do; and (4) the existence of an irreconcilable conflict between the proposed class and the individual and union plaintiffs, who the County maintained agreed to the cost-sharing arrangement memorialized in the MOUs, which the plaintiffs now sought to invalidate.

The County's opposition to class certification also argued that the proposed class counsel was incapable of adequately representing the class because it had acted as the chief negotiator for the union plaintiffs, and had negotiated MOUs after the filing of the lawsuit. The County further asserted the action was moot because the union plaintiffs and their members, including the proposed class representatives, had agreed in the 2019 MOUs that the contributions they now challenged were an obligation of Legacy and

11

PEPRA members in perpetuity. Finally, the County argued the lawsuit could not be maintained because the plaintiffs had not filed a timely governmental claim before initiating the case.

ICERS and its Board filed a response to the plaintiffs' motion for class certification. Therein, ICERS stated that the dispute in the case centered "on the interpretation of language included in MOU's between 'safety members' and the County going back to 2001, and the interpretation of that same language in light of changes in the law that were enacted after the language was adopted and arguably upset the expectations of the parties." ICERS and its Board recognized "the issues presented in this case are primarily issues of law; once the contract is properly construed and the obligations of the parties under the contract settled, those terms can likely be applied to any affected individuals administratively with minimal judicial oversight. Indeed … 'resolution of this action will uniformly apply to affected members' and 'all of [plaintiffs'] claims are controlled by the same legal principles and basic factual circumstances.' "

ICERS stated it "believe[d] that declaratory relief might be sufficient as a practical matter and that a class action may not be necessary or appropriate." It argued, however, that the proposed class was overly broad, and that it should be limited to safety members. In addition, ICERS acknowledged that the plaintiffs satisfied both the numerosity and ascertainability requirements for class certification, but argued that conflicts among the safety members, specifically between the Legacy and PEPRA members, prevented plaintiffs from establishing a commonality of interest within the class.

ICERS contended that the resolution of the legal issues "might affect current or retired Legacy safety members or active PEPRA members in

12

different ways" and, therefore, their interests were potentially antagonistic to each other in a way that foreclosed the class representatives from adequately representing the proposed class. ICERS explained, "[a]ctive and retired Legacy members are differently situated by virtue of the fact that Legacy active members are still working and contributing to ICERS while retired Legacy members are no longer working or contributing to the benefits they are now receiving. In turn, all active and retired Legacy members are differently situated from all PEPRA members, who are not eligible to receive the 3% at 50 benefit but in the view of ICERS and the County are currently obligated under the above provisions of the 2001 County Resolution and underlying MOUs to contribute toward the UAAL." ICERS contended that because the resolution of the interpretation of the MOUs and relevant statutes "has at least the potential to benefit certain groups of employees and to disadvantage others," representation by the same class representatives and counsel was not adequate.

In their reply brief in support of their motion for class certification, the plaintiffs agreed that the class should include only safety members. With respect to the County's assertion that the plaintiffs failed to sufficiently establish they satisfied the numerosity and ascertainability criteria for class certification, the plaintiffs pointed to the MOUs contained in the record, ICERS' actuarial reports identifying over 300 safety members, and ICERs concession that the numerosity and ascertainability requirements were plainly satisfied.

With respect to the issue of conflicts among the class members, the plaintiffs responded that the community of interest requirement was satisfied because both categories of ICERS safety members, Legacy and PEPRA, seek to place the burden of paying for the liabilities created by the enhanced

13

benefit on ICERS and the County. The plaintiffs explained that "the crux of the claim in this matter is that [ICERS and the County] are forcing both categories of Safety Members to pay for [UAAL] costs related to the Enhanced Safety Benefit that are the sole responsibility of the County." Further, they asserted the rights of all of safety members turn on their contractual rights under the 2001 MOUs. Plaintiffs argued that the conflict between the two groups of safety members was manufactured by the County "to avoid paying for the UAAL costs they contracted for in the 2001 MOU …."

With respect to adequacy, the plaintiffs asserted that the classes were already well defined by the MOUs and ICERS annual actuarial reports, thus the putative class representatives from each of the two groups of safety members were adequate representatives of the proposed class. Finally, plaintiffs noted that the proper remedy for any antagonism between the groups of ICERS members would be the creation of subclasses for the Legacy and PEPRA safety members, not denial of class certification altogether.

At the hearing on the motion for class certification, the trial court focused initially on the issue of whether the plaintiffs' claims were precluded by the Government Tort Claims Act. The court then turned to class certification. After acknowledging that the numerosity requirement was satisfied, the court expressed concern about the perceived conflict that existed between Legacy and PEPRA members. The court focused on the desires of both groups to have their own benefits fully funded, and hypothesized that the Legacy members would want the PEPRA members to fund their enhanced benefit, while the PEPRA members' interests were served by not contributing to the costs associated with the enhanced benefit they would never receive.

14

Counsel for the plaintiffs responded that the conflict raised by the court was not central to the lawsuit. Rather, the plaintiffs' claims centered on the County's improper imposition of the UAAL liability for the enhanced benefit on PEPRA members. In simple terms, both groups wanted each group to pay for their own benefit normal costs and for the County to pay for the UAAL. Counsel explained that the plaintiffs made no claim that the PEPRA members should pay for the enhanced benefit. Counsel further pointed out that such a hypothetical was not possible under the law and reiterated that the primary issue in the lawsuit was whether the County or the members (either Legacy or PEPRA) should be required to pay for the unfunded liability. Counsel also asserted that subclasses were the proper remedy to address the hypothetical conflict raised by the court, not denial of class certification.

The County's counsel repeated its argument that the Legacy and PEPRA members' interests were directly antagonistic to each other, and also argued that the union plaintiffs had agreed to the division of costs through the MOUs, defeating their claims in the present lawsuit. ICERS counsel stated that if the case were to move forward as a class action, the classes should be divided into subclasses. ICERS counsel also told the court its clients were "not interested in a resolution of this matter that would lead to a multiplicity of lawsuits" and that it was "not completely adverse to this moving forward as a class action, as long as all these various conflicts and complications are resolved." At the conclusion of the hearing the court took the matter under submission.

Thereafter, the court issued its order denying class certification. The order found the "divergent interests of the class members" precluded certification and that "an irreconcilable conflict between legacy safety

15

members and PEPRA safety members" goes "to the very subject matter of the case." The court explained that the two groups' interests conflicted because if the cost-sharing agreement contained in the MOUs "is invalidated, as the putative class representatives want, the benefit would no longer be funded at all as the County's contributions were conditioned upon the contribution of the safety members." The court also concluded that it could not find the proposed class representatives were adequate because "none of the putative class representatives submitted declarations in support of the motion."

The plaintiffs timely appealed from the order.

DISCUSSION

I

*General Legal Principals*

"We review the trial court's ruling for abuse of discretion. 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification. ... [Accordingly,] a trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made …. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326–327 (*Sav-On*).) "Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal ' "even though there may be substantial evidence to support the court's order." ' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436.) "Nonetheless, for the underlying factual issues, '[w]e must "[p]resum[e] in favor of the certification order ... the existence of every fact the trial court could reasonably deduce from the

16

record." ' " (*Wilson v. La Jolla Group* (2021) 61 Cal.App.5th 897, 909 (*Wilson*).)

Code of Civil Procedure section 382 authorizes a class action "whenever 'the question [in a case] is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court ....' (Code Civ. Proc., § 382; see *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1078; *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 458.)" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) The California Supreme Court has "articulated clear requirements for the certification of a class. The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker,* at p. 1021.) "The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Sav-On, supra*, 34 Cal.4th at p. 326.)

"The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' [Citation.] A trial court ruling on a certification motion determines 'whether … the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Sav-On, supra*, 34 Cal.4th at p. 326.) " ' "The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] ...

17

'As a general rule, if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " ' " (*Wilson, supra*, 61 Cal.App.5th at p. 908.)  Class treatment, however, " 'is not appropriate "if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the 'class judgment' " on common issues.' " (*Ibid.*)

To determine if the community of interest requirement is satisfied, " '[a] court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible.' [Citation.]  'As one commentator has put it, "what really matters to class certification" is "not similarity at some unspecified level of generality but, rather, dissimilarity that has the capacity to undercut the prospects for joint resolution of class members' claims through a unified proceeding." ' " (*Wilson, supra*, 61 Cal.App.5th at p. 908.)

"The relevant comparison lies between the costs and benefits of adjudicating plaintiffs' claims in a class action and the costs and benefits of proceeding by numerous separate actions—*not* between the complexity of a class suit that must accommodate some individualized inquiries and the absence of any remedial proceeding whatsoever." (*Sav-On, supra*, 34 Cal.4th at p. 339, fn. 10.)  Further, "[c]ourts seeking to preserve efficiency and other benefits of class actions routinely fashion methods to manage individual questions.  For decades '[our Supreme Court] has urged trial courts to be procedurally innovative' [citation] in managing class actions, and 'the trial court has an obligation to consider the use of … innovative procedural tools proposed by a party to certify a manageable class." (*Ibid.*)  "Such devices

18

permit defendants to 'present their opposition, and to raise certain affirmative defenses.' " (*Id*. at pp. 339–340.)

In addition, the existence of a *potential* conflict among class members does not defeat the superiority of the class mechanism. (See *Daniels v. Centennial Group, Inc.* (1993) 16 Cal.App.4th 467, 471–472 [unavailability of recission for representative plaintiffs' fraud claims created a potential conflict with putative class members, but proper remedy for the potential conflict was the creation of subclasses, not denial of class certification] (*Daniels*); *National Solar Equipment Owners' Assn. v. Grumman Corp.* (1991) 235 Cal.App.3d 1273, 1286 ["Even if a conflict should later appear, we believe denial of certification was too drastic a remedy. ... [O]ur Supreme Court urged trial courts to define classes in such a manner as to 'permit utilization of the class action procedure.' [Citation.] For example, the trial court could have created subclasses to deal with the conflict."].) Only if the potential conflict " 'goes to the very subject matter of the litigation,' " should class certification be denied. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 (*Richmond*).) " '[I]f the court can … divide the class into subclasses or … separate those issues that merit class action treatment so as to remove any antagonism, then the action need not be dismissed.' " (*Id*. at pp. 470–471.)

## II

### *Analysis*

#### A

##### *Community of Interest*

The unions and proposed class representatives challenge the trial court's conclusion that they did not satisfy the community of interest requirement for class certification. They make two primary arguments. First, the plaintiffs contend that insufficient evidence supported the court's

19

finding because it was based not on a factual conflict but on "assumptions and inconsistencies." Second, the plaintiffs argue the trial court engaged in an incorrect legal analysis by focusing on "a hypothetical conflict between Legacy members and PEPRA members," rather than on the plaintiffs' theory of recovery.

ICERS and its Board respond that the trial court's conclusion should be upheld because the court "reasonably inferred that the 2001 agreements could be interpreted in various ways that would affect the economic interests of different groups of employees differently and that each group would be motivated to advance its own economic interest." Further, they argue the trial court was rightly concerned that the plaintiffs' "claims will require the court to construe the 2001 Agreement and the effect of PEPRA on that agreement despite the fact that different employees groups are differently situated with respect to that agreement …."

The County similarly argues that the plaintiffs' theory of recovery creates an inherent conflict between the different groups of class members because an outcome that benefits PEPRA members will come at the expense of the Legacy members. The county also argues the trial court's order must be affirmed because the plaintiffs failed to meet their evidentiary burden to show the existence of an ascertainable class and a well-defined community of interest. In addition, the County argues that contrary to the plaintiffs' assertion, the trial court applied the proper legal criteria and based its determination on the plaintiffs' theory of recovery. Finally, the County argues that the court's failure to certify subclasses was proper because the plaintiffs did not provide a workable proposal for subclasses.

As discussed, a conflict among the members of a putative class that goes to the subject matter of the dispute in a proposed class action can defeat

certification. (*Richmond, supra*, 29 Cal.3d at p. 470.) By hypothesizing that the claims held by the groups of ICERS safety members contained within the proposed class were antagonistic, the trial court concluded such a conflict exists in this case. However, the plaintiffs' complaint as well as the identification of the issues by ICERS and its Board, lead us to conclude the trial court's determination was not supported by the evidence and also based on improper criteria because it failed to consider the use of subclasses to address the potential conflict it identified. Thus, we hold the court's denial of class certification was error.

As ICERS points out, the plaintiffs' claims are based on their assertion that the 2001 MOUs requiring safety members to pay the "total prospective increased costs" of the enhanced benefit was intended to require those members "to pay only the 'normal costs' associated with the benefit" and not any UAAL arising therefrom. The County, in contrast, asserts that the MOU requires the safety members to pay all costs, including any UAAL attributable to the benefit. This dispute, as ICERS states, "is one of the core issues in the underlying litigation." We agree. The resolution of this issue of contract and statutory interpretation is the central question presented by the plaintiffs' complaint.

Similarly, the trial court will be tasked with determining whether safety members hired after PEPRA became effective agreed to fund UAAL costs associated with the enhanced benefit under the applicable MOUs and law. As the plaintiffs explained in their motion for class certification, they assert that ICERS and the County have required PEPRA safety members to contribute to the UAAL for the 3% at 50 benefit in violation of section 7522.30, subdivision (c), and other state wage and hour laws. In addition, the plaintiffs allege that PEPRA safety members are being unilaterally required

to contribute more than 50% of the normal costs of their benefits in violation of section 7522.30, subdivision (e).

The determination of these additional issues of contract and statutory interpretation are necessary to the adjudication of the claims of all members of the proposed class. For example, as ICERS states, the plaintiffs "assert that safety members hired after 2012 cannot be held responsible for any costs associated with the 3% at 50 benefit, [but] there is no language in [the MOUs] that would distinguish among various groups of Safety Members." This is a common "issue ultimately requiring resolution by the trial court."

Although the end result of these determinations may impact the groups of class members differently depending on when they entered ICERS, these questions of law that must be resolved are common to all members of the proposed class, presenting the classic case for certification. "The one decisive issue pervading the litigation, whether the class members have been wrongfully deprived of pension benefits by an improper method of computation, will not be decided on the basis of facts peculiar to each class member, but rather, on the basis of a single set of facts applicable to all members. ... Consolidation in a class action thereby creates substantial benefits for both the parties and the courts[, averting] numerous and repetitive administrative and judicial proceedings with the attendant possibility of inconsistent adjudication." (See *Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 933, disapproved on other grounds by *Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955.)

The trial court concluded that the interests of the Legacy and PEPRA members were in conflict because the Legacy members had an interest in receiving the enhanced benefit at no cost and at the expense of the PEPRA members. However, the claims asserted by the plaintiffs do not posit the

22

members against each other in this way. Rather, both groups assert that the pension system has required them to contribute to the UAAL costs in violation of their agreements and the law. The plaintiffs do not contend, in the manner advanced by the County and found by the trial court, that PEPRA members are responsible for any UAAL costs, or any other costs, associated with the enhanced benefit available to the Legacy members. Rather, the plaintiffs seek a judicial determination that the MOUs allocated all such UAAL costs to the County and not to either group of safety members. In this way, the two groups of class members' interests are, as the plaintiffs argue, aligned.

In contrast, the potential conflict the County asserts will arise from the determination of these issues is only a hypothetical one. It argues that if the cost-sharing agreements found in the MOUs are interpreted in the manner the plaintiffs want, the Legacy members will suffer. However, no party suggests such an outcome is required by the plaintiffs' interpretation of the agreements. Additionally, and importantly, this state's class action jurisprudence requires the court to use available "procedural tools proposed by a party to certify a manageable class." (*Sav-on, supra*, 34 Cal.4th at p. 339.) The subclasses identified by the plaintiffs in their complaint, in their reply to their class certification motion, and at the hearing on the motion are just such a workable tool. The creation of subclasses for these groups can address conflicts that might arise between them. Accordingly, we conclude that the denial of class certification on this basis was not supported by the evidence before the court and constituted an abuse of the court's discretion.

Further, the court failed to analyze the issue under the applicable legal standard. The trial court was required to assess whether individual questions impaired the benefits that are created by proceeding with a group

23

action.  (*Wilson, supra*, 61 Cal.App.5th at p. 908.)  Here, although a potential conflict might arise between the Legacy and PEPRA safety members, no party contends that the *individual* issues of class members predominate over common ones in a manner " ' "that has the capacity to undercut the prospects for joint resolution … through unified proceedings." ' " (*Ibid*.)  At most, the County and ICERS contend that there are four groups of litigants, Legacy and PEPRA members, and Legacy and PEPRA retirees, whose interests are not totally aligned.

For this reason, denial of class certification was not the proper resolution of the motion.  Rather, the creation of subclasses of the four groups will address any disagreement that might arise in the litigation among them as a result of the determination of the underlying agreements and Government Code provisions.  (*Daniels, supra*, 16 Cal.App.4th at p. 472 ["denying class certification for the entire action on [the basis of differences in eligibility for rescission] is much like using a nuclear weapon to kill a fly"]; *Sav-On, supra*, 34 Cal.4th at p. 339 [" 'a class action cannot be maintained where *each member's* right to recover depends on facts peculiar to his case ….' " (italics added)].)

The legal issues of contract and statutory interpretation that must be resolved to determine who is responsible for the UAAL costs associated with the enhanced benefit available to Legacy members are common among all safety members of ICERS.  As the plaintiffs asserted in their motion for class certification, "even though some class members have been damaged more than others, all of [the proposed class's] claims are controlled by the same legal principles and basic factual circumstances."  The trial court's concerns, i.e., that the law and agreements might be interpreted to require PEPRA safety members to be held responsible for costs associated with the enhanced

24

benefit they are not eligible for, can be addressed through subclasses of these members.

In addition, the trial court must determine the same legal questions for purposes of the plaintiffs' claims for mandamus, and declaratory and injunctive relief. This fact further highlights the inefficiency and potential for conflict created by denying class certification. All of the proposed class members, regardless of when they joined ICERS or retired, are necessarily affected by the outcome of these claims. (See, e.g., *Probe v. State Teachers' Retirement System* (9th Cir. 1986) 780 F.2d 776, 780–781 (*Probe*) [concluding potential conflict between currently retired teachers and those still working that might arise in litigation over pension benefits that could result in higher contributions by working teachers did not render class certification improper].[2]) The creation of subclasses for these groups addresses the potential for conflict *and* provides each group with a voice in the litigation.

We also note that in the trial court, even ICERS acknowledged that a common form of relief, i.e., the declaratory relief sought by plaintiffs, was the most expeditious resolution of the case because the dispute "centers on the interpretation of language included in MOU's between 'safety members' and the County going back to 2001, and the interpretation of that same language

---

[2] We agree with the County and ICERS that *Probe* does not directly address the same potential conflict identified by the trial court in this case. The claims, however, do bear some similarities to *Probe*, which concerned the certification of a class of members of a pension plan that the plaintiffs alleged was improperly calculating benefits in violation of federal equal protection law. *Probe* supports the general proposition that a hypothetical conflict between members is not a sufficient basis for denying class certification. In particular, as the court in *Probe* concluded, the award of the injunctive and declaratory relief sought by the class plaintiffs in the case will impact both groups of ICERS members regardless of class certification. (*Probe, supra*, 780 F.2d at p. 781.)

in light of changes in the law that were enacted after the language was adopted and arguably upset the expectations of the parties." ICERS also recognized that "[w]hile the resolution of these issues may affect individual employees differently (to the extent that all retirement benefits are affected by individual circumstances), the issues presented in this case are primarily issues of law; once the contract is properly construed and the obligations of the parties under the contract settled, those terms can likely be applied to any affected individuals administratively with minimal judicial oversight" and that, "as [plaintiffs] acknowledge, 'resolution of this action will uniformly apply to affected members' and 'all of [their][ claims are controlled by the same legal principles and basic factual circumstances.' " These statements further support our conclusion that a common resolution of these issues is superior to individual adjudication of the class members' claims.

Finally, in our view, the basis for the trial court's ruling also improperly reached into the merits of the legal questions presented in this litigation. Rather than considering whether common questions predominate over individual questions by focusing on the contours of the plaintiffs' claims, the court hypothesized how various outcomes would differently impact the groups. As the plaintiffs point out, the court ignored their characterization of the claims, which were based on the allegation that the County and ICERS were requiring excessive contributions from both Legacy and PEPRA members to fund the UAAL associated with the enhanced benefit.

At class certification, the court considers the commonalities and differences of the claims, but does not reach the merits of those claims unless it is necessary to assess whether common issues predominate. "[A]ny 'peek' a court takes into the merits at the certification stage must 'be limited to those aspects of the merits that affect the decisions essential' to class certification."

26

(*Brinker, supra*, 53 Cal.4th at p. 1024.) Here, the court based its finding of conflict on the interpretation of the agreements and the law that *the County* argued would result if the court ultimately agreed with the plaintiffs' claim. The trial court, however, did not need to reach into these merits to determine if there was a sufficient community of interest among the class members.

As discussed, the plaintiffs' class action complaint does not seek to invalidate the MOUs or change the benefits promised to any ICERS safety member. Rather, it asks the court to adjudicate the proper rates of contribution under the law and to prevent the County from requiring safety members to contribute to UAAL costs related to the enhanced safety benefit, which plaintiffs contend is the sole responsibility of the County. In light of the actual claims asserted, the trial court's focus on the outcome advanced by the County in its determination of whether common issues predominate over any individual ones was improper.

The trial court's finding that there was not a sufficient community of interest among the proposed class is reversed.[3] On remand, if the court

---

[3] The County and ICERS and its Board do not argue that the plaintiffs failed to establish that the class is sufficiently numerous or ascertainable. The record before this court shows that there are more than 300 ICERS safety members whose identities are easily ascertained from ICERS records, satisfying these requirements.

determines that the proposed class representatives are adequate (discussed in the next section), the court is directed to grant the plaintiffs' motion for class certification and to create subclasses for the four groups of class members identified during the certification proceedings—Legacy and PEPRA safety members of ICERS and Legacy and PEPRA retirees—and to appoint appropriate class counsel for each subclass.

B

*Adequacy of Representation*

In addition to finding that the community of interest requirement was not satisfied, the trial court also concluded that the plaintiffs failed to meet their burden of proof to show they were adequate representatives of the class. Specifically, the court found that the putative class representatives had not submitted declarations in support of the motion for class certification.

The plaintiffs assert that denial of the motion on this ground was improper, and instead the court should have provided the plaintiffs with the opportunity to amend their submissions to show the proposed class representatives were adequate. We agree with the County that the plaintiffs failed to meet their burden of proof. However, the motion for class

_____

The County does argue that the plaintiffs failed to show that use of the class procedure was superior to other forms of action, specifically declaratory relief. However, because the plaintiffs seek the return of excess contributions, the use solely of declaratory relief is insufficient. Further, it is obvious that common adjudication of these common legal questions is superior to a multitude of individual claims by the class members. (See *In re Cipro Cases I & II* (2004) 121 Cal.App.4th 402, 410 ["The nature and circumstances of the [agreements at issue]—and their legality under California law—raise identical factual and legal issues as to every member of the class. For every single class member to litigate these common issues separately would impose a substantial burden on the courts and the litigants."].)

28

certification should not have been denied on this basis, and instead the plaintiffs should be afforded the opportunity to submit supplemental declarations from the proposed class representatives to support their claims of adequate representation.

As the County argues, "[p]laintiffs seeking class certification have the burden of proving the adequacy of their representation by a member of the putative class." (*Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 998 (*Jones*).) The class representatives " ' "assume a fiduciary responsibility to prosecute the action on behalf of the absent parties. [Citation.] The representative parties not only make the decision to bring the case in the first place, but even after class certification and notice, they are the ones responsible for trying the case, appearing in court, and working with class counsel on behalf of absent members." ' " (*Ibid.*) To establish the proposed class representatives are up to this important role, the plaintiffs must provide evidence, typically declarations, showing their "desire[] to represent the putative class or that they underst[and] the obligations of serving as class representatives." (*Ibid.*)

Here, the plaintiffs did not provide declarations from the proposed class representatives to support a finding that they could fulfill their obligations to the class or subclasses. Thus, the court's conclusion that the plaintiffs had failed to meet their burden on this issue was supported by substantial evidence. "The lack of an adequate class representative, however, does not justify the denial of the class certification motion. Instead, the trial court must allow plaintiffs an opportunity to amend their complaint to name a suitable class representative," or in this case submit declarations from the proposed class representatives in support of their claim of adequate

29

representation.  (*Jones, supra*, 221 Cal.App.4th at p. 999; see also *Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1309.).

On remand, the trial court is directed to permit the plaintiffs to submit supplemental declarations from the proposed class representatives for the court's consideration.[4]

## DISPOSITION

The order denying the plaintiffs' class certification motion is reversed. On remand, the trial court is directed to permit the plaintiffs to file supplemental declarations of the proposed class representatives concerning whether they are adequate representatives.  Further, if the trial court approves the class representatives, the court is directed to certify the class, with subclasses for Legacy and PEPRA safety members, as well as retirees falling into these two categories, and appoint appropriate class counsel for each subclass.  Plaintiffs are awarded the costs of appeal.

---

[4]     The County also argues that an independent basis for affirmance is the inadequacy of the class counsel.  It asserts that because the plaintiffs' attorney represented the Unions in negotiations of the MOUs, class counsel is conflicted from pursuing claims seeking to invalidate those agreements.  As discussed, the plaintiffs' claims do not center on invalidating the MOUs.  Rather, they advance an interpretation of those agreements that places the liability for UAAL associated with the enhanced safety benefit on the County, not on any group of ICERS safety members.  Further, given our direction to the trial court to utilize subclasses and appoint class counsel for each, any perceived conflict is eliminated.

                                                    McCONNELL, P. J.

WE CONCUR:



                    DO, J.



                    BUCHANAN, J.